```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE SOUTHERN DISTRICT OF IOWA
 2                       DAVENPORT DIVISION


 3
    UNITED STATES OF AMERICA,       )
 4                                  )
              Plaintiff,            )  ORIGINAL
 5                                  )
              VS.                   )  CRIMINAL NO. 3:16-cr-70
 6                                  )
    AMERICA YEGILE HAILESELASSIE,   )
 7                                  )
              Defendant.            )
 8                                  )


 9
                        TRANSCRIPT OF PROCEEDINGS
10                      BEFORE THE HONORABLE CHIEF JUDGE JOHN JARVEY
                        Tuesday, February 13, 2018; 1:32 p.m.
11                      DAVENPORT, IOWA


12
    FOR THE PLAINTIFF:
13  RICHARD D. WESTPHAL
    Assistant United States Attorney
14  131 East Fourth Street
    Davenport, IA  52801

15

16  FOR THE DEFENDANT:
    MULLIN & LAVERTY LC
17  By:
    ANNE M. LAVERTY
18  Attorney at Law
    1636 42nd Street, N.E.
19  Cedar Rapids, IA  52402


20


21  Interpreter:  Amy Cook


22


23
                   LINDA FAUROTE-EGBERS, CSR 622(IA), FCRR, RMR
24                     FEDERAL OFFICIAL COURT REPORTER
                        131 East Fourth Street
25                      Davenport, Iowa  52801
```

1                          I N D E X

2
   WITNESS                    ATTORNEY                         PAGE
3
   Matt Schmit               Mr. Westphal                        5
4                            Ms. Laverty                        19

5  Rachelle Kunde            Mr. Westphal                       27
                             Ms. Laverty                        32
6                            Mr. Westphal                       35

7  V. Susan O'Brien          Mr. Westphal                       36

8

9

10

11

12 GOVERNMENT'S EXHIBITS                        Offered    Received

13 1  -  Letter to Detective Bennett from
         America Haileselassie                     43          44
14
   2  -  Letter to Richard Westphal from
15       America Haileselassie                     43          44

16 3  -  Letter to Richard Westphal from
         America Haileselassie                     43          44
17
   4  -  Letter to Richard Westphal from
18       America Haileselassie                     43          44

19 5  -  Letter to Detective Kunde from
         America Haileselassie                     43          44
20
   6  -  Letter to Judge Jarvey from
21       America Haileselassie                     43          44

22 7  -  Letter to Richard Westphal from
         America Haileselassie                     43          44
23
   8  -  Testimony of Harry James Gekas            43          44
24

25

1          THE COURT:  Please be seated.  The record can reflect

2   that we are here in the matter of United States versus America

3   Haileselassie, it is case 3:16-cr-70.  Mr. Haileselassie is

4   before the Court for sentencing.  He pleaded guilty on October

5   20, 2017, to Count 2 of the Indictment returned on April 19th.

6          He is present, he is represented by Anne Laverty and

7   assisted by a sign language interpreter.

8          Ms. Interpreter, we will give you your oath at this

9   time.

10          (The interpreter was duly sworn.)

11          THE INTERPRETER:  I do.

12          THE COURT:  Thank you.

13          Between the time of his guilty plea and now Mr.

14   Haileselassie has sent a number of letters to the Court.  On

15   December 18th I directed the clerk to file one as a Motion for

16   Substitution of Counsel and/or a Motion to Withdraw his Guilty

17   Plea.  There was also a pro se Motion for return of certain

18   property.

19          Ms. Laverty, do you know if he still desires

20   substitution of counsel or to withdraw his guilty plea?

21          MS. LAVERTY:  No, Your Honor.  The defendant would

22   withdraw those two Motions.

23          THE COURT:  He just informed you of that in court?

24          MS. LAVERTY:  He did, Your Honor.

25          THE COURT:  Thank you.

1           So in preparation for sentencing I have reviewed the

2   Presentence Report in its entirety as well as the Sentencing

3   Memoranda from the government and the defendant.  I also

4   received sentencing exhibits on -- that were filed on February

5   12th and there's still some objections that need to be resolved

6   as they relate to the Sentencing Guidelines.

7           I agree with the defendant, he was not on probation at

8   the time.  The government still persists in its desire to see

9   the defendant receive three levels off for acceptance of

10  responsibility so perhaps the two issues remaining, Ms. Laverty,

11  are whether there was -- there should be an enhancement for

12  substantial disruption to public government or business

13  functions and the obstruction of justice enhancement.

14          Do you have argument that you would like to make on

15  those?

16          MS. LAVERTY:  Your Honor, I believe most of it would

17  be contained in the brief that I filed.  The four-level

18  enhancement applies to situations where there's a substantial

19  disruption and the cases that -- there's a few cases on this

20  situation, but the ones that were cited were clearly different

21  than this situation with Mr. Haileselassie.

22          He did not cause the college to be shut down, he did

23  not cause classes to be interrupted, those kind of

24  characteristics are more appropriate for the application of the

25  four-level enhancement and sort of the same thing with the

1  two-level enhancement for obstruction of justice.  Although

2  there were some false leads that were called in, those kind of

3  things do not -- did not necessarily require the government to

4  engage in a great deal of additional investigation and so

5  there's not been any substantial obstruction or disruption of

6  government as well.

7           THE COURT:  Thank you.

8           Mr. Westphal, just on the Guideline issues.

9           MR. WESTPHAL:  The government does have evidence to

10  present on both substantial disruption and the obstruction

11  issue.

12           THE COURT:  Go ahead.  Call your witness.

13           MR. WESTPHAL:  First call Matt Schmit.

14           THE COURT:  Please come forward, sir.  If you will

15  approach the clerk, she will administer your oath.

16           MATT SCHMIT, GOVERNMENT'S WITNESS, SWORN

17                    DIRECT EXAMINATION

18  BY MR. WESTPHAL:

19  Q.  Good afternoon.

20  A.  Hello.

21  Q.  Can you state your name and spell your last name for the

22  record, please?

23  A.  Matt Schmit, last name is spelled S-c-h-m-i-t.

24  Q.  And what is your current occupation?

25  A.  I am working at Scott Community College and I am Dean of

1  Operations there.

2  Q.  If that microphone is on, I will have you speak up a little

3  bit more.

4  A.  I work at Scott Community College and I am the Dean of

5  Operations there.

6  Q.  How long have you been the Dean of Operations at Scott

7  Community College?

8  A.  Approximately six years.

9  Q.  And as the Dean of Operations can you describe for us what

10 type of duties you have at Scott Community College?

11 A.  So the physical operations, the day-to-day operations of the

12 college, including security matters.

13 Q.  And can you just maybe give us an example of the type of

14 things you do in relation to security matters?

15 A.  Establish protocol for reacting to all type of emergency

16 situations, cooperate with the Scott County Sheriff's Office on

17 coverage for our campus.

18 Q.  Now, were you working as the Dean of Operations in November

19 of 2015?

20 A.  Yes.

21 Q.  And in November of 2015, on November 2nd and November 4th,

22 there were two bomb threats received at Scott Community College.

23          Do you recall that?

24 A.  Yes.

25 Q.  Now, describe for us first, is there some type of protocol

1  or procedure that Scott Community College has in place when a

2  bomb threat is received?

3  A.  Yes, we have what is called an Emergency Readiness Plan

4  which there's a specific section in there regarding responses to

5  bomb threats.

6  Q.  And are there certain steps that are followed as part of

7  that plan?

8  A.  Yes.

9  Q.  Can you maybe just describe for us what those steps are?

10  A.  First and foremost we would direct protocol for

11  communication to get the leadership team together and the second

12  step then would be to contact the law enforcement for that, get

13  them on the way, and then we have a protocol where we basically

14  pull a team together to do a very area-specific search depending

15  on what the threat says to the areas where basically we don't

16  touch anything, but we are looking for any type of suspicious

17  activity.

18  Q.  Now, the first step is you get a team together?

19  A.  Correct.

20  Q.  Who does that team consist of?

21  A.  Typically that team is all the administrators on the campus.

22  Q.  And how many normally would that be?

23  A.  There are six administrators all together on most days,

24  three or four of those administrators will be on campus on

25  average.

1  Q.  Now, at the Scott Community College campus -- let me ask a

2  different question.

3          You send out communication to other individuals in the

4  college once a bomb threat is received?

5  A.  Communicationwise the only thing we would send out would be

6  after, you know, everything is secured and after we communicate

7  with the Sheriff's Office and take their recommendation.

8  Q.  Well, when you get your team together and you are conducting

9  a search, are there certain people designated to assist with

10  that?

11  A.  Yes.

12  Q.  How are they notified they need to assist?

13  A.  We go and get them verbally.

14  Q.  And are they verbally told where they are needed?

15  A.  Yes.

16  Q.  If it is a bomb threat, they will be informed there's a bomb

17  threat?

18  A.  Yes, the protocol is basically we are using their assistance

19  to search the area for any type of suspicious activity so we

20  have to tell them what that is.

21  Q.  How many people is that?

22  A.  That will add seven or eight people to the average three or

23  four that are on the team.

24  Q.  How many buildings are there on the Scott Community College

25  campus?

1   A.   There are four separate buildings.

2   Q.   And these seven to eight people, are they from -- at least

3   one person or more from each of the buildings?

4   A.   Yes, so typically we construct this team based on people who

5   have knowledge of those areas.  For example, we are going to

6   pick somebody in the culinary arts building who is familiar with

7   the culinary arts building.

8   Q.   And what type of things are they instructed to look for in

9   relation to a bomb threat?

10  A.   So again, with them being familiar with their areas,

11  anything that would be out of place, unattended bags, things of

12  that nature, we do check -- we have lockers on our campus still

13  so those are checked, you know, it is a general search; but

14  basically anything we are looking for is something that would be

15  out of the ordinary.

16  Q.   Do they check inside classrooms?

17  A.   Yes.

18  Q.   Inside offices?

19  A.   Yes.

20  Q.   And is a normal part of the protocol a law enforcement

21  agency is notified?

22  A.   Correct.

23  Q.   And the agency that is responsible for Scott Community

24  College is which agency?

25  A.   Scott County Sheriff's Office.

1    Q.  Now let's talk about November 2nd of 2015.  There was a bomb

2    threat printed out on a printer at or around 11:25 a.m.

3            Do you recall that?

4    A.  Correct.

5    Q.  And where was that threat printed out at?

6    A.  It came across a printer in our Student Success Center.

7    Q.  Now, at 11:28 a.m. on November 2nd, what was going on on

8    campus?

9    A.  We were in the middle -- classes were all in session,

10   basically a normal day in the middle of a semester for us.

11   Q.  So there are students in classes?

12   A.  Correct, yup.

13   Q.  Students traveling the halls?

14   A.  Typically the morning sessions are our busiest.

15   Q.  And the teachers and staff present as well?

16   A.  Correct.

17   Q.  Once the threat was received on November 2nd, was the

18   protocol you just described, was that followed?

19   A.  Yes, it was.

20   Q.  And did you assist in the search that day?

21   A.  Yes, I did.

22   Q.  And describe for us some of the actual search activity you

23   conducted on November 2nd.  What do you recall?

24   A.  The area of the building that I was specifically checking

25   was a classroom area so if there was a class that was in session

1   there, what we typically go do is ask the faculty member to step

2   out of the classroom, ask them if they have seen anything

3   suspicious, and then kind of look in the room with them a little

4   bit, have them look around and keep an eye out as well and then

5   had to do that for each individual classroom that was in

6   session.

7   Q.   Some of these classrooms had students in them?

8   A.   A majority of them did.

9   Q.   Did you actually go in the classrooms and look around?

10   A.   I did.  I would tend to just kind of peek my head in, left

11   it more to that faculty member to do that final check to make

12   sure that there was nothing out of place.

13   Q.   Would it be obvious to the students watching that someone

14   was looking for something?

15   A.   Although we try to not raise alarm, there is -- that is not

16   typical that I would go into those classrooms and do that.

17   Q.   Now, the Student Success Center where the threat was

18   received, are there classrooms in that building as well?

19   A.   Yes.

20   Q.   Now, at some point in time on November 2nd did members of

21   the Scott County Sheriff's Office arrive?

22   A.   Yes.

23   Q.   And also members of the bomb squad?

24   A.   Yes.

25   Q.   And did they conduct a search as well?

1   A.   They did.

2   Q.   And what did you see -- what type of search were they doing?

3   A.   We were in my office which was primarily where we were

4   gathering as a group.  From there I could see that there was a

5   dog there, the Sheriff's Office dog, I don't remember the

6   gentleman's name, but the bomb squad leader was there, and they

7   also assisted in doing another search of the building.

8   Q.   Did they search all four buildings, if you remember?

9   A.   I don't know that offhand.

10  Q.   Which building did you see them search?

11  A.   They were in the main building for sure.

12  Q.   And again, it would have been apparent to you and other

13  people watching that they were searching for something?

14  A.   Correct.

15  Q.   As a result -- you are the person responsible for security

16  at Scott Community College, correct?

17  A.   Correct.

18  Q.   On November 2nd did you get questions from staff as to what

19  was going on?

20  A.   We did.  So after the large law enforcement presence on

21  campus, my office started taking numerous calls from students,

22  parents of students, staff, faculty members, all inquiring for

23  the most part what was going on.

24  Q.   And what type of information were they told?

25  A.   At that time we were working through the Sheriff's Office

1  and we said we would be putting a statement out soon.

2  Q.  And did you end up providing any statement that there was a

3  bomb threat at the Scott Community College?

4  A.  We did.  Per our protocol we put out a statement to all

5  students and staff.

6  Q.  Did anyone at Scott Community College decide to leave in

7  response to the fact there was a bomb threat on November 2nd?

8       MS. LAVERTY:  Objection.  Foundation.

9       THE COURT:  Overruled.  Answer the question, if you

10  know.

11       THE WITNESS:  We had -- what I can say is we had calls

12  of students who basically did not feel comfortable coming back

13  onto campus unless we could tell them what was going on and at

14  that time we had not released our statement.

15  BY MR. WESTPHAL:

16  Q.  Now, on November 2nd, once the search was conducted and

17  finished, nothing -- no bomb was found, correct?

18  A.  No.

19  Q.  Were -- does Scott Community College have its own IT or

20  technology group of people?

21  A.  We do.

22  Q.  And were you aware that in response to the bomb threat that

23  they were trying to figure out where the bomb threat came from?

24  A.  They were.  I was involved in that process with them as

25  well.

1  Q.  And what type of things were they doing to try to determine

2  -- identify where the bomb threat came from?

3  A.  So the part of the process I was mostly involved with was

4  looking at the security cameras, looking for a -- physically

5  looking to see where that threat may have came from.  They were

6  also looking on our network for any type of clues where it maybe

7  came from as well.

8  Q.  Did they have to spend extra time looking for the source of

9  this print job?

10  A.  Yes.

11  Q.  And you spent extra time as well looking at security

12  cameras?

13  A.  Yes.

14  Q.  Or looking for individuals on the security cameras?

15  A.  Yes.

16  Q.  Now, on November 4th of 2015 there was a second bomb threat

17  sent to the printer at the Student Success Center, correct?

18  A.  Yes.

19  Q.  Approximately 10:00, 10:28 a.m.?

20  A.  Yes, that sounds correct.

21  Q.  And again, was the same busy activity or was -- was it

22  basically the same activity as November 2nd at the college?

23  A.  Correct.

24  Q.  Students in classes, correct?

25  A.  Yes.

1   Q.   Teachers, staff present?

2   A.   Yes.

3   Q.   And on November 4th did you and other administrators invoke

4   the same bomb threat protocol that you did on November 2nd?

5   A.   Yes, the second threat we followed the exact same protocol

6   as we did on the two days previously.

7   Q.   Notified the same number and type of people?

8   A.   Yes.

9   Q.   Conducted a search of all four buildings?

10  A.   Yes.

11  Q.   Inside classrooms, outside classrooms?

12  A.   Yes.

13  Q.   Now, again, when you notified the staff to assist in the

14  search, did you tell them again it is a bomb threat?

15  A.   Same scenario as the previous.

16  Q.   Now, in your time as Dean of Operations at Scott Community

17  College have there been a lot of bomb threats at Scott Community

18  College?

19  A.   In my time at Scott Community College those are the only

20  two.

21  Q.   So it would be uncommon for staff to receive notice that

22  there's been a bomb threat during your time?

23  A.   Yes.

24  Q.   And even more so two times in two days?

25  A.   Yes.

1  Q.  Now, after you conducted your search on November 4th was

2  anything found?

3  A.  No.

4  Q.  Did you receive or were you aware after the search had been

5  conducted of calls from people who were concerned about what was

6  going on on November 4th?

7  A.  Yes, there was concerns as well, especially since it was the

8  second time in three days at that point we had had one of these,

9  what the college was doing to -- to basically ensure the safety

10  of the students and staff.

11  Q.  And who did those concerns come from?

12  A.  Faculty, students, parents of students.

13  Q.  Now, in relation to the November 4, 2015, bomb threat, there

14  was information that at least appeared to identify that America

15  Haileselassie was connected to that bomb threat, correct?

16  A.  Correct.

17  Q.  Now, prior to November 4th of 2015 were you aware of the

18  history of America Haileselassie at Scott Community College?

19  A.  Yes.

20  Q.  And what was your understanding of Mr. Haileselassie's

21  history at Scott Community College?

22  A.  There had been some previous incidents with him at the

23  college, one involving him being on a part of our network, our

24  IT network that I know was very concerning, it made our IT

25  department very nervous about where he was at and what he was

1   doing there so there was that alert as well as just various

2   other issues with him from a disciplinary standpoint.

3   Q.  How does his presence at Scott Community College change the

4   dynamics of the campus?

5   A.  Our faculty and staff are aware of his presence on campus

6   and that is due to the previous things that had transpired to

7   the bomb threats.

8   Q.  Were you aware that he had been involved in other activity

9   that disrupted activity at Scott Community College?

10  A.  Yes.

11  Q.  Were you aware that America Haileselassie expressed, prior

12  to November of 2015, his dissatisfaction with Scott Community

13  College?

14  A.  Can you repeat that question?

15  Q.  Yes.  Were you aware, prior to November 2015, whether or not

16  America Haileselassie had any complaints about Scott Community

17  College?

18  A.  America had been through a process for one of the

19  disciplinary items that was -- where he went through the -- I

20  would say the appeals process, received discipline, went through

21  an appeals process, which I was part of that as well, and the

22  appeal was upheld by the committee and the president and from

23  that, I have a feeling he was not happy with the college from

24  that process.

25  Q.  Now, after the November 4, 2015, bomb threat were you -- did

1  you again work with the IT department to figure out how the

2  print -- the bomb threats had been sent to the printer?

3  A.   The second one?

4  Q.   Yes.

5  A.   Yes.

6  Q.   And did again the IT department have to spend more time

7  trying to figure out how it was done?

8  A.   They did.  We had a little better idea of what we were

9  looking for on the second time, but they definitely had to do a

10  lot of work in the background.

11  Q.   And did you yourself spend additional time trying to

12  identify specifically if it was America Haileselassie who sent

13  the threat?

14  A.   Not me specifically on that one because I think at that time

15  we realized that the print job that came across was likely not

16  from somebody physically on our campus.

17  Q.   Do you know, did the IT department end up checking all the

18  computers in the Student Success Center?

19  A.   They did.

20  Q.   In your approximately six years as the Dean of Operations at

21  Scott Community College, have you ever been involved with a bomb

22  threat that did not involve America Haileselassie?

23  A.   No.

24          MR. WESTPHAL:  Those are my questions for now.

25          THE COURT:  Ms. Laverty?

1          MS. LAVERTY:  Thank you, Your Honor.

2                    CROSS-EXAMINATION

3  BY MS. LAVERTY:

4  Q.  Good afternoon, sir.

5  A.  Hi.

6  Q.  So I'd like to ask you a couple of questions --

7          THE COURT:  That microphone isn't on.  Would you press

8  the button halfway up the microphone?

9  BY MS. LAVERTY:

10  Q.  I would like to ask you some questions about this Emergency

11  Readiness Plan as applied to situations of a report of a bomb

12  threat.

13          First of all, were you involved in preparing or

14  organizing that item in the first place?

15  A.  Yes.

16  Q.  And so it is something that you and other presumably

17  administrators have developed to address this very situation?

18  A.  Correct.

19  Q.  Did you use any particular model or other suggested plan

20  when you were putting it together?

21  A.  So the plan has been around for a long time, we review it

22  every year, that's reviewed by the administrative team.  The

23  origin of the plan, I can't tell you for sure what that is.

24  Q.  That was my next question, is it reviewed and you said it is

25  reviewed every year.  Thank you.

1          So according to the protocol, the first thing in a

2    situation of a bomb threat is to gather the leadership team that

3    you can get together and start the process, right?

4    A.   Correct.

5    Q.   Okay.  Does that differ if the threat is different?

6    A.   So there's multiple, you know, so there's tornado protocol,

7    for example, and so there's probably -- and I'm guessing here --

8    about 30 different protocol.

9    Q.   Okay.  So a fire, natural disaster?

10   A.   And there are different -- they are different.

11   Q.   Okay.  As far as the bomb threat protocol goes, at what

12   point would it be suggested or recommended to order an

13   evacuation of the building and close offices and that such of

14   thing?

15   A.   Our policy states that all threats are treated as real until

16   proven otherwise; but evacuation is not done until the threat is

17   verified or by the discretion of law enforcement.

18   Q.   All right.  So presumably the administrators on deck would

19   potentially be able to make at least an initial evaluation if

20   the threat was something that required an evacuation before even

21   law enforcement gets there?

22   A.   If there was something verifiable that looked out of place,

23   we would evacuate at that point.

24   Q.   Okay.  So the garbage can smoking in the building or

25   something like that?

1 A.   Right.

2 Q.   You didn't have to here, right?

3 A.   No.

4 Q.   In fact, once law enforcement arrived, did they suggest that

5 you evacuate the building?

6 A.   No.

7 Q.   On either occasion, the 2nd or the 4th of 2015?

8 A.   No.

9 Q.   Were any classes or classrooms actually closed and everybody

10 kicked out of the classroom for purposes of a search?

11 A.   No.

12 Q.   So the actual physical classroom was searched in I think you

13 said an unobtrusive manner or not to raise alarm?

14 A.   Correct.   We would go into the classrooms, but with the

15 intent of doing our job and not raising alarm.

16 Q.   So the expectation would be after you or the other person

17 assigned to that classroom departed, the class would continue as

18 normal as possible?

19 A.   Correct.

20 Q.   And the only person that should know what is going on is the

21 instructor?

22 A.   The person -- so you have office area, you know; but in a

23 classroom, yes.

24 Q.   Okay.   Were any of the buildings closed as a result of

25 either of these bomb threats?

1  A.   No.

2  Q.   Does your campus have the ability to send like a text alert

3  blast?

4  A.   Yes.

5  Q.   Did you in 2015 have the ability?

6  A.   So our communication goes out via text and via e-mail.

7  Q.   All right.  So eventually that was done with respect to

8  these two threats, only after law enforcement gave you the okay,

9  correct?

10  A.   Correct.

11  Q.   What time of day did that happen on November 2nd and

12  November 4th?

13  A.   I don't have an exact time, but it was -- it was that

14  afternoon, you know, I would say a couple hours after the event.

15  Q.   Was the same printer involved in both threats?

16  A.   Yes, I believe it was.

17  Q.   Was there any particular reason why that printer was not

18  disconnected from the network after the first threat if there

19  were concerns about how somebody got into the network and was

20  able to send this print job?

21  A.   During the first threat we honestly believed that it was

22  somebody in our building doing it so we were approaching that

23  much more from checking each computer standpoint and keeping our

24  eyes out for any type of specific activity related to that.

25  Q.   So it was not a suspicion that that particular printer was

1  hooked up to another particular user off campus, which is what

2  supposedly happened?

3  A.  Correct.  After the first one we were looking for somebody

4  on-site.

5  Q.  All right.  But you still didn't disconnect that printer or

6  check that printer?

7  A.  Correct.  It is the main printer for that area.  It serves

8  multiple locations in that area.

9  Q.  So are there other printers in that life center?

10  A.  Not near that capacity.

11  Q.  You testified the faculty and staff would have been aware of

12  Mr. Haileselassie's presence as a student on campus.  Was that

13  done then when he was enrolled in the fall of 2015?

14  A.  I don't understand the question.

15  Q.  You testified that faculty and staff were aware that Mr.

16  Haileselassie was a person who had had prior disciplinary issues

17  with the college and that he would be on campus.  When was that

18  notification made to staff that he would be enrolling in the

19  fall?

20  A.  There was no notification.

21  Q.  Okay.

22  A.  Through the things that had happened previously.

23  Q.  All right.  So from memory, not really any specific

24  notification?

25  A.  I can't speak for them, but what I can tell you is my office

1  took calls that people were well aware that he was on campus.

2  Q.  And this was before November 2nd?

3  A.  Correct.

4  Q.  On November 2nd or November 3rd at any time did you suspect

5  that this was the action of a person on campus who had had

6  problems with the college, somebody who had a beef against the

7  college?

8  A.  By the nature of what it is, yes.

9  Q.  And did you have suspicion specifically that it might be Mr.

10  Haileselassie?

11  A.  No.

12  Q.  After the November 4th bomb threat came in did you begin to

13  suspect it might be Mr. Haileselassie?

14  A.  After the second one?

15  Q.  Yes.

16  A.  Yes.

17  Q.  And why?

18  A.  When the second print job came through, the person who was

19  working in that area, the person at the college, and I believe

20  it was because it was a multiple-page print job which was

21  similar to what happened earlier, went to look at the printer

22  and when they went to look at the printer, the -- I don't

23  remember what it was offhand, but there was an address that they

24  wrote down which we provided to the Sheriff's Office that was

25  like -- we thought at that point it could be Mr. Haileselassie's

1   address.

2   Q.   So on the printer itself is there a screen or something that

3   can identify either the name of the print job, the name of the

4   sender?

5   A.   Yeah, so I believe that employee went at that point to stop

6   the print job and right next to it is where it's, you know, a

7   four by six digital screen.

8   Q.   Okay.   And that gave a clue it might be Mr. Haileselassie?

9   A.   Correct.

10   Q.   You couldn't do that the first time because the print job

11   had completed?

12   A.   That's my understanding, yes.

13   Q.   Was there any way to get into the printer and find the list

14   of print jobs or where they came from even though it is not

15   showing on the screen?

16   A.   There may have been, but we did not find anything in the

17   first two days that would lead to that.

18   Q.   When did you personally feel that the investigation had been

19   resolved and law enforcement had caught the right person?

20   A.   After the second one we handed the information over to them.

21   At that point they were doing what they do with that information

22   and we did not receive any more bomb threats.

23   Q.   Were you aware that someone was charged in state court with

24   a crime related to these acts?

25   A.   In state court?

1   Q.   When did you become aware that Mr. Haileselassie was

2   charged?

3   A.   We were contacted by I believe the -- was it the County

4   Attorney or I can't remember who that was, they were pressing

5   charges.

6   Q.   And that would have been November --

7   A.   I don't remember offhand.

8   Q.   Was it shortly after the bomb threats though?

9   A.   I believe so.

10  Q.   What other actions has the college taken to ensure that Mr.

11  Haileselassie is informed that he is not welcome on campus?

12  A.   So we have an official process obviously regarding

13  suspension and so on and we follow our typical protocol there.

14  Q.   And as far as you know that's been completed?

15  A.   That is a question for our Dean of Students.

16  Q.   All right.  Have there been any changes to the Emergency

17  Readiness Plans that were made as a result of the actions and

18  response to these two bomb threats?

19  A.   Not to my knowledge.

20          MS. LAVERTY:  Thank you.

21          THE COURT:  Anything else, Mr. Westphal?

22          MR. WESTPHAL:  No.

23          THE COURT:  Thank you, sir.  You are excused.

24          THE WITNESS:  Thank you.

25          MR. WESTPHAL:  I want to call Rachelle Kunde.

1          THE COURT:  Come forward, ma'am.

2               RACHELLE KUNDE, GOVERNMENT'S WITNESS, SWORN

3                    DIRECT EXAMINATION

4    BY MR. WESTPHAL:

5    Q.   Good afternoon.  Can you state your name for the record?

6    A.   Rachelle Kunde.

7    Q.   And what is your current occupation?

8    A.   Deputy sheriff.

9    Q.   With the Scott County Sheriff's Office?

10   A.   Yes.

11   Q.   And how long have you been employed with the Scott County

12   Sheriff's Office?

13   A.   20 years.

14   Q.   In November of 2015 what was your duty assignment?

15   A.   I was in investigations at that time.

16   Q.   And did you become involved in the investigation concerning

17   the bomb threats at Scott Community College?

18   A.   I did.

19   Q.   And do you recall when you became involved?

20   A.   On the date of the 4th when the second one came in, that was

21   when I was notified about it because of the e-mail address that

22   showed up.

23   Q.   And you, as part of this investigation, participated in a

24   search warrant at Mr. Haileselassie's residence?

25   A.   Yes.

1  Q.  And interviewed Mr. Haileselassie?

2  A.  Yes.

3  Q.  Now, also as part of this investigation on November 5th of

4  2015 did you have any contact with individuals at Scott

5  Community College as far as what they were doing to try to

6  determine how these threats were sent?

7  A.  I was -- I don't know the exact details, I know that IT was

8  looking into trying to figure out how these threats were coming

9  in through this printer.

10  Q.  And were they devoting a lot of time finding that out?

11  A.  Yes.

12  Q.  And, in fact, after November 5th there was another print job

13  identified as Mr. Haileselassie sent to Scott Community College?

14  A.  Correct.

15  Q.  And up until that point the IT department, despite working

16  on it, hadn't figured out how he was doing it?

17  A.  That's correct.

18  Q.  Now, since Mr. Haileselassie has been charged in Federal

19  Court with making these threats, have you received letters from

20  Mr. Haileselassie?

21  A.  Yes.

22  Q.  And what is the general things he expresses to you in these

23  letters?

24  A.  That he was not the person who had sent those threats and

25  that we needed to look back into it again to find the real

1  person.

2  Q.  And he would have known from your contact with him on

3  November 5th that you were one of the investigators for this

4  case, correct?

5  A.  Correct.

6  Q.  Now, in the spring of 2017, May and June, did you become

7  aware that there were some tips made to Crime Stoppers

8  concerning these bomb threats?

9  A.  Yes.

10  Q.  And just generally what is your understanding, what is Crime

11  Stoppers?

12  A.  Crime Stoppers is a service that people can call into or

13  e-mail regarding crimes that are out there and give information

14  regarding a certain crime.

15  Q.  And had the Crime Stoppers tip line received at least two

16  calls that claimed -- the caller claimed to have information

17  about these bomb threats?

18  A.  Yes.

19  Q.  And in those calls did they identify or give a name of the

20  individual who was making the bomb threats?

21  A.  Yes.

22  Q.  And what was that name?

23  A.  Gabriel Stropes.

24  Q.  Based on that crime -- well, you became aware of these Crime

25  Stoppers tips, correct?

1  A.  Yes.

2  Q.  And based on that did you go out and try to find this

3  Gabriel Stropes?

4  A.  I did.

5  Q.  And were you able to find him?

6  A.  Yes.

7  Q.  And did you interview Gabriel Stropes?

8  A.  I did.

9  Q.  And where did that interview take place?

10  A.  In Illinois.

11  Q.  And when you approached Mr. Stropes, what was his reaction

12  when you told him why you wanted to talk to him?

13  A.  When I explained to him that his name was brought up in a

14  bomb threat and with a bomb threat with a bomb, he became very

15  upset.

16  Q.  Physically upset?

17  A.  Yes.

18  Q.  And were you able to ask him further questions at that point

19  in time?

20  A.  I was able to ask him further questions.  Mr. Stropes is

21  hearing impaired as well as autistic and I spoke to him at

22  Hy-Vee with his employer present, somebody that could kind of

23  help relay information to him and calm him down, so I was able

24  to talk to him there; however, because he was upset, we decided

25  to call his mother and have her also come to the interview or

1   the talk.

2   Q.  And did she come?

3   A.  Yes.

4   Q.  And from that interview did you obtain any information that

5   would have pointed to Gabriel Stropes as the individual that

6   made these bomb threats?

7   A.  No.

8   Q.  In your interviews of Gabriel Stropes and -- well, let's

9   start with Gabriel Stropes.  Did he know America Haileselassie?

10  A.  Yes.

11  Q.  And when you spoke to Gabriel Stropes' mother, did she know

12  America Haileselassie?

13  A.  Yes.

14  Q.  And had there been -- did they describe some past history of

15  conflict with Mr. Haileselassie?

16  A.  Yes, they did.

17  Q.  Now, also did these Crime Stopper tips describe events

18  concerning a briefcase that was apparently lost by Mr.

19  Haileselassie that may have had -- or stolen from him at Black

20  Hawk Community College?

21  A.  Yes.

22  Q.  So at the time of the threats Mr. Haileselassie was also

23  taking classes at Black Hawk Community College, is that correct?

24  A.  That's correct.

25  Q.  And did you spend time trying to get more information

1    concerning this lost briefcase at Black Hawk Community College?

2    A.  Yes.

3    Q.  And did Black Hawk Community College send some information

4    about that lost briefcase?

5    A.  Yes.

6    Q.  Was it returned to Mr. Haileselassie after the two bomb

7    threats?

8    A.  Yes.

9              MR. WESTPHAL:  I think those are my questions for now.

10             THE COURT:  Ms. Laverty?

11             MS. LAVERTY:  Thank you, Your Honor.

12                            CROSS-EXAMINATION

13   BY MS. LAVERTY:

14   Q.  Deputy Kunde, you testified that you got some letters from

15   America Haileselassie.  How many letters did you receive?

16   A.  I don't remember exactly.  There had to be four or five

17   probably different letters.

18   Q.  And were those letters addressed to you at your personal

19   residence?

20   A.  They were at the Sheriff's Office.

21   Q.  Okay.  And were they addressed to you as -- in your capacity

22   as detective?

23   A.  Yes.

24   Q.  Did those letters contain any form of personal threat

25   against your safety or that of anyone in your department?

1  A.   No.

2  Q.   As far as you know did those letters actually come from Mr.

3  Haileselassie?

4  A.   As far as I know, yes, they were from the jail.

5  Q.   They were from the jail and he signed them and everything?

6  A.   Correct.

7  Q.   Based on those letters in which you said he was stating that

8  he was not the sender, we needed to reopen the investigation,

9  did you reopen the investigation?  Did you follow up on any of

10  the leads that he identified?

11  A.   No.

12  Q.   So as a result of four or five or six letters there's

13  nothing new in there that you felt needed to be investigated?

14  A.   No, basically the letters just stated that he was not the

15  person who did it, that we needed to look farther to see if we

16  could find someone else.

17  Q.   There were some tips made to the Crime Stoppers tip line.

18  How does that work?  Does it get sent to a specific agency if a

19  tip comes in?

20  A.   Yes, it goes to an Illinois agency and then what they do is

21  they kind of farm out to whoever was investigating that crime.

22  Q.   So they figure out who it should go to?

23  A.   Yes.

24  Q.   Upon receiving I think you said about two tips about Gabriel

25  Stropes, what did you do to investigate those?  You went and

1  interviewed them, right?

2  A.  Yes, I had to figure out if that was actually a real person.

3  Q.  Okay.

4  A.  And then track him down and try to make contact with him to

5  speak with him regarding if he knew anything about these bomb

6  threats.

7  Q.  So you did one interview with him?

8  A.  Yes.

9  Q.  And anything further in followup with Mr. Stropes?

10 A.  We had some e-mail correspondence, there were some e-mails

11 that he had forwarded to me that the defendant had sent to him

12 when they had an issue a year or so before that, but nothing

13 concerning this.

14 Q.  Was there anything in those tips that named Gabriel Stropes

15 that required different followup or different investigation

16 other than talking to Mr. Stropes?

17 A.  Can you rephrase that?

18 Q.  Sure.  Following up on these two Crime Stoppers tips, you

19 said you went and did an interview -- figured out who Mr.

20 Stropes was and if he existed and talked to him.

21       Was there anything else in the tips that required you

22 to follow up, talk to anybody, investigate, reopen the

23 investigation?

24 A.  Not per se.  Once I talked to Mr. Stropes and his mother and

25 verified where they went to school and those type of things, I

1  felt comfortable that it probably wasn't an accurate tip.

2  Q.  Are you aware Mr. Haileselassie has for over 25 years

3  occasionally called in to 911 and other law enforcement

4  facilities with false reports?

5  A.  I believe I was aware of that during this investigation, but

6  I had never been involved with him prior to this.

7  Q.  So when the bomb threats were being investigated, did

8  anybody say hey, you should check and see if this is Mr.

9  Haileselassie, he does stuff like this?

10  A.  No, I was not notified about it until that e-mail address

11  showed up on the 4th.

12  Q.  Okay.  So on the 4th you said, right?

13  A.  Yes.

14        MS. LAVERTY:  Thank you.  Nothing further.

15        THE COURT:  Anything else?

16                   REDIRECT EXAMINATION

17  BY MR. WESTPHAL:

18  Q.  When you were following up on these Crime Stopper tips, did

19  you become aware at some point in time there were some records

20  subpoenaed from the chat line at Muscatine County Jail?

21  A.  Yes.

22  Q.  And did those records identify the individual making the

23  Crime Stoppers tips was Mr. Haileselassie himself?

24  A.  Yes.

25  Q.  And that impacts your decision to pursue anything further

1  whether or not Mr. Stropes was a suspect or not?

2  A.  That's correct.

3           MR. WESTPHAL:  Thank you.

4           THE COURT:  Anything else, Ms. Laverty?

5           MS. LAVERTY:  No, Your Honor.

6           THE COURT:  Thank you, ma'am.

7           Anything else?

8           MR. WESTPHAL:  I want to call Susan O'Brien.

9           THE COURT:  Please come forward, ma'am.

10           SUSAN O'BRIEN, GOVERNMENT'S WITNESS, SWORN

11                     DIRECT EXAMINATION

12           THE COURT:  When you are seated comfortably, we want

13  that microphone closer to you so pull it a little closer if you

14  can.

15           THE WITNESS:  Okay.

16           THE COURT:  Go ahead, Mr. Westphal.

17                     DIRECT EXAMINATION

18  BY MR. WESTPHAL:

19  Q.  Good afternoon.

20  A.  Good afternoon.

21  Q.  Can you tell us for the record what your name is?

22  A.  My name is V. Susan O'Brien.

23  Q.  And can you spell your last name for us?

24  A.  O, apostrophe, B-r-i-e-n.

25  Q.  Now, let me introduce myself.  I am Rich Westphal from the

1   U.S. Attorney's Office.  You have had some contact with our

2   office prior to today, is that correct?

3   A.   Correct.

4   Q.   We have never met face to face until now?

5   A.   No.

6   Q.   Now, Ms. O'Brien, do you know an individual by the name of

7   Gabriel Stropes?

8   A.   Yes.

9   Q.   And how do you know Gabriel Stropes?

10  A.   He's my son.

11  Q.   How old is Gabriel?

12  A.   Gabriel is 26.

13  Q.   And was there a period of time when Gabriel was a student at

14  Black Hawk Community College?

15  A.   Yes.

16  Q.   Do you recall what period of time that would have been?

17  A.   He was quite a long student there.  He graduated last spring

18  and he -- I think he went there four years, maybe longer.

19  Q.   Okay.

20  A.   From the time he graduated from high school.

21  Q.   Does Gabriel also have some physical challenges?  Does he

22  have any hearing --

23  A.   He's hearing impaired and autistic.

24  Q.   And he is still able to graduate from college?

25  A.   Two-year degree, yes.

1  Q.  Two-year degree?

2  A.  General.

3  Q.  Now, during the time he was at Black Hawk Community College

4  did you become aware that he met a student by the name of

5  America Haileselassie?

6  A.  Yes.

7  Q.  And do you recall how they met?

8  A.  Through an interpreter.

9  Q.  Introduced them?

10  A.  She introduced them, yes.

11  Q.  And did your son have a lot of friends at Black Hawk

12  Community College?

13  A.  Not a lot.  For Gabe he had a fair amount.  He's grown up

14  with not so many people being his friends.

15  Q.  He seeks out looking for friends?

16  A.  Yes, yes.

17  Q.  And did -- once you learned that Gabriel had met America

18  Haileselassie did they do activities together?

19  A.  At school.

20  Q.  Okay.  What type of activities?

21  A.  They were in the computer club together I believe.

22  Q.  And did your son consider Mr. Haileselassie at least

23  initially as his friend?

24  A.  Yes.

25  Q.  At some point in time did his views change on that?

1  A.  Yes.

2  Q.  And was there something that caused his -- some event that

3  caused that to change?

4  A.  There was -- I don't remember exactly what it was, but I

5  know that there was a problem, there was an argument,

6  disagreement of some sort.

7  Q.  And did America Haileselassie ever do anything that upset

8  your son Gabriel?

9  A.  He turned him in to the Dean.

10  Q.  For what?

11  A.  I believe that he accused him of sexual harassment of a

12  teacher.

13  Q.  Was that true?

14  A.  No.

15  Q.  And was there, in fact, no action taken on that complaint?

16  A.  They investigated it and found no finding.

17  Q.  Do you know, did -- was there anything that Mr.

18  Haileselassie would have been upset toward your son about?

19  A.  I'm -- I'm not sure at this point what that was.  I know he

20  was, I know he was disappointed because he thought he was his

21  friend.

22  Q.  Do you recall Gabriel talking at all about Mr. Haileselassie

23  wanting to take him on a trip?

24  A.  Yes, not too long after they met.

25  Q.  And where was the trip to?

1  A.  Chicago.

2  Q.  And did your son go?

3  A.  No.

4  Q.  Why not?

5  A.  Because he discussed it with us, his parents, and it was a

6  red flag for us.  We didn't know America and Gabe didn't know

7  him that well and he wasn't sure where they were going or

8  anything and then we did a little bit of background check.

9  Q.  So did Gabriel inform you Mr. Haileselassie was going to go?

10 A.  Yes.

11 Q.  And do you recall any reaction from Mr. Haileselassie?

12 A.  Yes.

13 Q.  What was that?

14 A.  He was mad at Gabe because Gabe was doing what his parents

15 told him to do instead of what he wanted to do.

16 Q.  Now, was there something in relation to a Facebook page that

17 was created during the time that these problems occurred between

18 your son and Mr. Haileselassie?

19 A.  I believe there was something that went back and forth, but

20 I don't remember what.

21 Q.  Okay.  Did you end up filing some type of complaint with

22 Black Hawk Community College about Mr. Haileselassie?

23 A.  We filed the complaint first and then America filed his

24 complaint against Gabe.  We wanted America to just leave Gabe

25 alone.

1    Q.   Was that the nature of your complaint?

2    A.   I know it was part of it.   I don't know if it was all of it.

3    Q.   And Mr. Haileselassie's complaint came after you filed a

4    complaint against him?

5    A.   Correct.

6    Q.   Now, do you recall in October of 2017 that Detective Kunde

7    came out and spoke with Gabe and then you arrived and spoke with

8    her as well?

9    A.   Yes.

10   Q.   And Detective Kunde told you why she was looking to speak to

11   Gabriel?

12   A.   Yes.

13   Q.   And what was your son's reaction after learning what he was

14   being accused of?

15   A.   He was really upset, very upset, he was agitated, he was

16   scared.   That about sums it up.

17   Q.   Now, after this period of time when you filed a complaint,

18   you wanted Mr. Haileselassie to leave your son alone, after that

19   did Mr. Haileselassie try to contact you?

20   A.   He did.   He had contacted me about how lonely Gabe was at

21   school in an e-mail and I told him it was none of his business

22   and for him to not e-mail me ever again.

23   Q.   Did he?

24   A.   Yes.

25   Q.   How many times?

1  A.  It was just probably one or two times.  I just bluntly told

2  him not to do it again and then I didn't reply.

3  Q.  How did you feel once you learned that your son was being

4  accused of this bomb threat by Mr. Haileselassie?

5  A.  Oh, my gosh, I was devastated.  I thought he was out of our

6  life.  I surely didn't think that he was going to come creeping

7  back with something like that.

8  Q.  Are you afraid of him?

9  A.  Yes.

10          MR. WESTPHAL:  Those are my questions.

11          THE COURT:  Ms. Laverty?

12          MS. LAVERTY:  None, Your Honor.

13          THE COURT:  Thank you, ma'am.  You are excused.

14          MR. WESTPHAL:  I think that's my evidence for now,

15  Your Honor.

16          THE COURT:  Do you have anything you wish to present,

17  Ms. Laverty?

18          MS. LAVERTY:  No, Your Honor.

19          THE COURT:  Do you have argument in response to hers?

20          MR. WESTPHAL:  I do, Your Honor.  The cases I think

21  cited in the government's Sentencing Memorandum I think expand

22  the type of circumstances that can qualify for the substantial

23  disruption.  The defendant's argument based on what is limited

24  to the buildings being evacuated and the college being shut

25  down, I don't believe that's what the other cases show so the

1   other factors those cases support are the personnel that have to

2   respond, the amount of time they have to spend reacting and

3   preventing and providing security.

4           As testified by Dean of Operations Schmit, even though

5   there wasn't evacuations or shutting down the college, there

6   certainly was known to the students there for both of these bomb

7   threats that there was a bomb threat and that people were

8   searching, they had students that were asking to leave early,

9   they had faculty and staff concerned for safety, they had

10  numerous people from Scott Community College having to respond,

11  take time out of their day and look for these bomb threats, and

12  the IT department spent a considerable amount of time finding

13  out how exactly these prints were being sent so based on that

14  information and the testimony of Dean of Operations Schmit that

15  there was, in fact, a substantial disruption at Scott Community

16  College for both these days.  This is not a common occurrence at

17  Scott Community College and Mr. Haileselassie's intent by even

18  making these threats is to disrupt Scott Community College.

19  This is exactly what these facts show that he did.

20          In relation to the obstruction, I think the government

21  has shown by a preponderance of the evidence the defendant did

22  substantially impede the prosecution and investigation of this

23  offense and I guess I also want to -- before I finish my

24  argument I sent the Court Exhibits 1 through 9, 1 through 8

25  being the letters and 9 being the testimony of James Gekas, we

1    ask that those be admitted in support of these two enhancements

2    as well.

3            THE COURT:  Ms. Laverty?

4            MS. LAVERTY:  No objection to those.

5            THE COURT:  They are received.

6            MR. WESTPHAL:  But based on these -- the letters

7    themselves, Mr. Stropes -- I'm sorry, Mr. Haileselassie spent

8    considerable time trying to divert this investigation away from

9    himself and when these letters won't work or did not work, in

10   fact, at a point in time the court records show he was ordered

11   to stop sending the letters, but they kept coming, he decided to

12   take that further and make these Crime Stopper tips from the

13   jail.  As set out in more detail in the Presentence Report, he

14   was basically -- was provided as a privilege at the jail access

15   to this deaf chat line and instead of using it as a privilege,

16   he used it to make these Crime Stopper tips and falsely accuse

17   another individual, Gabriel Stropes, of making bomb threats,

18   reprehensibly a kid that was just minding his own business and

19   his only reason for being involved in this was because he tried

20   to be friends with Mr. Haileselassie and now several years later

21   becomes named by him as a suspect in a threat that he's actually

22   been charged with and he's now pled guilty to so I think those

23   facts very strongly and definitively establish an obstruction of

24   justice enhancement.

25           THE COURT:  Anything else on the Guideline issues, Ms.

1  Laverty?

2         MS. LAVERTY:  Yes, Your Honor, just pointing out again

3  the Eighth Circuit case is not really on point, but the Cole and

4  Anwar cases that I cited do seem to have very good logic in

5  terms of both the scale and duration of an event and how long

6  and how large the disruption was.

7         Likewise, with respect to the letters, the

8  government's own evidence shows that they were not anything

9  other than respectful, professional, they were sent to the

10 people or the individual in their professional capacity only,

11 they were signed, and there weren't any additional threats made

12 in them and so if an individual is passing on information which

13 is to further the investigation, I'm not sure that there's an

14 obstruction of justice element to that.

15        I did want to respond to my colleague's representation

16 to the Court that the deaf chat line was a privilege.  That

17 would be an accommodation for a disability that the jail is

18 required to do in order to allow one of its inmates to

19 communicate and if telephone usage is a privilege, then I guess

20 we probably should be removing that as well from other inmates

21 because someone who did not use the deaf chat line could very

22 well have just called in and given a Crime Stoppers tip.

23        THE COURT:  Thank you.  So I find that the notice of

24 the bomb threat together with the engagement of the college's

25 emergency operations personnel, the notice to the students, the

1  reaction of the students, the need for the IT department to

2  investigate together with the need to search for a bomb all

3  provide evidence of what we already intuitively know that a bomb

4  threat substantially disrupts a college.  I find that that

5  enhancement applies.  The obstruction here is absolutely classic

6  obstruction of justice and applies as well.

7          He has a total offense level of 15 and a criminal

8  history category of V under the Sentencing Guidelines.  That

9  would suggest a range of imprisonment between 37 and 46 months.

10          I would had hear first from you, Ms. Laverty, then

11  from Mr. Haileselassie, then from Mr. Westphal before imposing

12  sentence.

13          MS. LAVERTY:  Thank you, Your Honor.  I'd like to

14  start out with a few statistics.  According to the Bureau of

15  Justice statistics in 2006, 45 percent of the federal prisoners

16  have mental health and behavioral problems.  In 2017 the same

17  agency surveyed again and found that about a third of the

18  inmates that have mental health problems get treatment,

19  two-thirds don't, and of those who do get treatment or who need

20  it actually get it.  Those -- about half say it wasn't even

21  helpful.  Some of the reasons they say it wasn't helpful is

22  inadequate staff, inadequate access, and a reliance on toss some

23  pills at a problem.  Inmates are five times more likely to have

24  mental health problems than the rest of the population.

25  Interestingly those with a college degree are actually more

1  likely or most likely to have a history with mental health

2  issues.

3        The three top mental health issues identified in the

4  study were major depressive disorder, bipolar disorder, and post

5  traumatic stress disorder, all the same things that Mr.

6  Haileselassie has been diagnosed with in the past and reviewed

7  for.

8        The Office of the Inspector General of the Department

9  of Justice just last July also did a review of the Bureau of

10  Prisons' use of restrictive housing for inmates so putting them

11  in the RHU or the SHU and the department's own investigation

12  found that there's a lot of room for improvement.  There's no

13  maximum time restraints, inmates might spend years or decades in

14  the SHU, in fact, it is not even really tracked until it had to

15  be done on an individual prison-by-prison basis.  Inmates with

16  mental health issues spend disproportionately longer periods in

17  the SHU as compared to other inmates and mental health staff in

18  the Bureau of Prisons don't even accurately document mental

19  health issues.

20        In 2014 there were some new standards that were

21  introduced to try to firm up the availability of mental health

22  counseling for inmates in the Bureau of Prisons and what

23  happened was it actually reduced by 30 percent the number of

24  inmates getting treatment.  Again, if the Bureau of Prisons was

25  told to do something, then they had to do something, they

1  suddenly found that they did not have sufficient resources to do
2  it so this is a very difficult issue the Bureau of Prisons is
3  dealing with and I think in society we are dealing with the same
4  thing.

5       Mr. Haileselassie has his entire life suffered from
6  both the challenges of being hearing impaired, but also some
7  mental health and behavioral challenges.  His biggest problem
8  really seems to be his anger issues and he's not had consistent,
9  reliable, and good mental health treatment at any point in his
10  life for anything other than a year.  He's not even had anything
11  in the last two years since he's been —— or year since he's been
12  in jail.  Sometime in 2006 was the last time he was seen at Vera
13  French.  This gentleman does need assistance.  He does not need
14  to be basically flushed into the Bureau of Prisons' system.

15       When we —— when we look at his history and his
16  characteristics, he has a history going back 25 years of false
17  reports, including bomb threats to the Bettendorf Police
18  Department, to the point where they pretty much know when his
19  caller ID came up that they could dismiss the call.  Mr.
20  Haileselassie, heaven forbid he would ever be in a situation
21  where you really do have to call 911, because it is questionable
22  whether the police would believe that there would be anything
23  going on.  It is a coping mechanism.

24       Normally my bank robber clients, my embezzlement
25  clients go to prison a couple times, they figure out what

1  behavior they can't be doing because it sends them to prison and

2  they stop doing it and unfortunately Mr. Haileselassie here

3  hasn't figured that out or it is something that he can't really

4  control.  I am not trying to suggest that he should be excused

5  from responsibility at all for his actions.  He acknowledges

6  that not only this behavior was wrong, but also that he has --

7  he has difficulty dealing with his emotions of frustration,

8  shame, loss, loneliness, and those are the things that were

9  plaguing him at that particular point in time in November --

10 October and November of 2015.

11          Another way to look at this, the -- this case itself

12 has certain gray points or important events such as the upcoming

13 trial deadline or plea deadline, an upcoming hearing that gets

14 canceled, different situations that bring things to a head.  If

15 you go back and look at the dates on the letters that have been

16 submitted by the government, if you go back and look at the

17 dates on the Crime Stoppers tips, funny thing, those all

18 correspond pretty closely to something big is coming up and

19 that's how Mr. Haileselassie deals with his anxiety is writing

20 letters, sending bomb threats, that sort of thing, and so it is

21 almost like deterrence is impossible for this person.  He has

22 been in prison 10 times, he's been on probation maybe five

23 times, obviously there's a need to protect the public, but that

24 is not really possible without some sort of rigorous

25 supervision.

1          Mr. Haileselassie needs his mental health issues dealt

2     with.  Unlike diabetes where we can test a person's blood sugar

3     and feed them carbs and feed them insulin if there is a need for

4     that, we don't have that kind of mentoring, we don't have that

5     way to observe how bad a mental health issue is, what it is, and

6     how it can be treated.  The best we can do is throw meds at it,

7     sometimes that doesn't work, but cognitive behavioral therapy

8     has shown to be effective when it is good and when it is

9     consistent for folks who have behavior issues related to mental

10    health, in other words, inmates so in looking at the kind of

11    sentences available, we would ask the Court to consider the fact

12    that Mr. Haileselassie has not really gotten anything out of

13    prison in the past, hasn't done any good, in fact, it has

14    interrupted his progress in trying to find his place in society.

15         He has fortunately the support of his mom.  As long as

16    she is alive, I'm certain that she will be able to keep an eye

17    on him to some extent, but it really does seem like the Court

18    can provide some additional assistance to her in that matter.

19    Mr. Haileselassie hasn't been able to hold a job.  He's

20    intelligent, he has some college, but he can't seem to hold a

21    job and he seems to get bored and have no friends, all of these

22    social issues affect what happens with his behavior and so

23    again, in considering what sort of punishment would be morally

24    just in this case, we would suggest that the Court sentence the

25    defendant to 24 or 30 months, considering he served about 15 or

1   16 months in jail already, that the rest of his sentence be

2   served in a residential facility, and that the Court review his

3   progress in court on a regular basis, every three months, every

4   six months, so that we can make sure that he is getting the

5   necessary services that the government is in a position to

6   provide on the outside, not on the inside, but on the outside,

7   and that he is making progress and he is not committing crimes,

8   but actually getting to a point where he can deal with some of

9   these feelings.  Those restrictions or those provisions will be

10  able to protect the public much better than really anything that

11  we have been able to do so far.

12          When he is on the outside, he calls in false threats,

13  he finds things to send on the computer.  When he's on the

14  inside, he calls in false threats and false leads and he writes

15  letters, so none of it is going to do any good and sending him

16  to prison is only going to just put him in a place where he will

17  not get get the help he needs.  At least on the outside he will

18  be able to have some assistance.  Again, that could be with the

19  assistance or with the additional threat of supervised release

20  hanging over his head, he could be sent back to prison or to

21  serve certain periods of time in jail if he does violate, but I

22  think with a very close supervision provision the likely of

23  success is much greater.

24          On the objections to Presentence Report, I believe I

25  objected to Paragraph 179 which dealt with the special

1 conditions of supervised release and specifically mental health

2 treatment.  I want to explain the reasons I objected to that.  I

3 definitely agree with the probation office's response that this

4 gentleman needs mental health treatment and he needs it to be

5 mandatory, he needs somebody to be watching over his shoulder to

6 make sure it gets done.

7 　　　　　I didn't like the wording of that particular condition

8 in the sense that it almost gave the Probation Office the power

9 to tell mental health providers what modality to use and exactly

10 what to use to treat him and I don't think that's their business

11 or their expertise at all so that's the reason that I objected

12 to that particular condition.

13 　　　　　Mr. Haileselassie is quite remorseful for his actions.

14 He has prepared an allocution in the form of a letter to the

15 Court.  I don't know if he is going to have additional remarks

16 here today, but he feels much more comfortable expressing

17 himself in writing.  In that allocution he indicates that he's

18 feeling a great deal of despair and he said sentence me to a

19 life sentence or to the death penalty because there's really no

20 hope for me in my life at this point.

21 　　　　　The Court has an opportunity to do something that an

22 awful lot of defendants do not get to take advantage of.  The

23 Court can, rather than flushing somebody into the great default

24 nuthouse of our country, the Court can try to assist this

25 gentleman in his rehabilitation.  Thank you.

1       THE COURT:  So I received his letter and I read it and

2   provided copies to counsel as well.  In addition to that, Mr.

3   Haileselassie, is there something else you would like to say?

4       THE INTERPRETER:  I just want to say in addition that

5   I'm very, very sorry for what happened.

6       THE COURT:  In the letter from your mother she said

7   she dies a little bit every day she is in court with you on

8   this.  How does that make you feel?

9       THE INTERPRETER:  Makes me feel very sad.

10      THE COURT:  Thank you.

11      In fashioning an appropriate sentence, I have

12   considered each of the factors found in Title 18, United States

13   Code, Section 3553(a).  That means I have considered the nature

14   and circumstances of this offense as well as the history and

15   characteristics of Mr. Haileselassie.

16      I have considered the seriousness of the offense.  Of

17   course a bomb threat to a community college is an exceedingly

18   serious event; but it is made far more serious by reason of his

19   criminal history going back so long involving very, very similar

20   events.  These are acts of terrorism.  I am not confusing him

21   about what we are fighting internationally, but these are serial

22   acts of terrorism.  You inflict fear for your enjoyment and you

23   get much pleasure out of the attention here in court and

24   elsewhere.  The false leads to try and accuse an innocent person

25   of your crime are reprehensible.

1         I have considered the question of just punishment and

2  note his criminal history.  I don't have to -- it is set forth

3  in the Presentence Report adequately.  It doesn't need to be

4  repeated here.

5         I have considered the need for adequate deterrence to

6  criminal conduct.  The need to protect the public from further

7  crimes from this defendant is exceedingly serious and I have

8  considered the sentencing options that are available to the

9  Court.  I look to the Sentencing Guidelines as an important,

10  though not in any way controlling factor to be considered, and I

11  have weighed heavily the need to avoid unwarranted sentencing

12  disparity among defendants with similar records who have been

13  found guilty of similar conduct.

14         I am very familiar with Mr. Haileselassie's tenure

15  through this Court over the years and I can honestly say I

16  cannot remember anyone who received more attention from the

17  Probation Office, who they worked with more diligently to try

18  and put them on the right path.  We have given him everything

19  that we have.

20         After considering all those factors, I conclude that

21  the Guideline sentencing system inadequately addresses the

22  circumstances of this defendant and that the range is

23  unreasonable.  The Court considers the following sentence to be

24  not greater than necessary to address the essential sentencing

25  considerations.

1              It is the judgment of the Court that America Yegile

2    Haileselassie is sentenced to the custody of the Bureau of

3    Prisons for 60 months on Count 2 of the Indictment.  Upon

4    release from prison you will be placed on supervised release for

5    one year.  Within 72 hours of release from the Bureau of Prisons

6    you shall report in person to the Probation Office in the

7    district where you are released.  While on supervised release

8    you shall not commit another federal, state, or local crime.

9    You shall not possess a firearm or destructive device.  You

10   shall not illegally possess a controlled substance.

11             You shall comply with all the standard conditions of

12   supervision as adopted by the Sentencing Commission plus the

13   special conditions in Paragraphs 177 to 180 of the Presentence

14   Report.  The objection to Paragraph 177 is overruled.

15             MS. LAVERTY:  179.

16             THE COURT:  Pardon me?

17             MS. LAVERTY:  179.

18             THE COURT:  Was it 179?  I'm sorry.  That's overruled.

19   Our Probation Office, first of all, doesn't tell -- doesn't tell

20   other treatment providers how to do their business, but this

21   cognitive behavioral treatment program as I understand it would

22   be the STARR program, correct, or not?

23             USPO JASON ABENDROTH:  Yes, Judge, it would typically

24   be in-house.

25             THE COURT:  That is our in-house kind of monitoring

1   with the journals and intensive supervision of an officer.

2           In addition to those terms of supervision, you shall

3   not be on the premises of Scott Community College, any premises

4   of them, and you shall not contact the college in any fashion

5   except through counsel or his mother.

6           There is no point in a fine here.  That is waived.

7   You are ordered to pay the $100 special assessment.  It is due

8   and payable immediately without interest to the Clerk of Court.

9           Is there any forfeiture here?

10          MR. WESTPHAL:  No.

11          THE COURT:  Are there counts to dismiss?

12          MR. WESTPHAL:  Yes, the government would move to

13  dismiss the remaining counts per the Plea Agreement.

14          THE COURT:  Count 1 is dismissed.  You have the right

15  to take an immediate appeal from this Judgment.  Any appeal must

16  be filed within 14 days from today.

17          Ms. Laverty, did you want me to make a recommendation

18  as to where he is incarcerated?  In your memo you said you

19  wanted him sent to a particular place, but I was just curious if

20  that is still what you want.

21          THE INTERPRETER:  In North Carolina, Butner.

22          THE COURT:  Why?

23          MS. LAVERTY:  FCI Butner.  The defendant has some

24  information that that may be appropriate.  Also if his mother

25  moves to the southeast part of the country, that would be closer

1  to her.

2          THE COURT:  You are talking about Butner?

3          MS. LAVERTY:  Yes.  Also the defendant --

4          THE COURT:  I recommend Butner.

5          MS. LAVERTY:  I'm sorry?

6          THE COURT:  I recommend Butner.  I think it is a good

7  idea.

8          MS. LAVERTY:  The defendant also had written to the

9  Court at one point about a question about getting his property

10 back.

11         THE COURT:  Mr. Westphal?

12         MR. WESTPHAL:  I will look at what it is he is asking

13 back.  We will return anything.

14         THE COURT:  Flash drives and a computer, things like

15 that.

16         MR. WESTPHAL:  Yes.

17         THE COURT:  All right.  And then you will report back

18 to the Court within 10 days?  Just file something saying --

19         MR. WESTPHAL:  Sure.

20         MS. LAVERTY:  Thank you.

21         THE COURT:  We are in recess.

22         (Proceedings concluded at 2:53 p.m., February 13,

23 2018.)

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5            I, Linda Faurote-Egbers, Federal Official Realtime

6    Court Reporter, in and for the United States District Court for

7    the Southern District of Iowa, do hereby certify that pursuant

8    to Section 753, Title 28, United States Code, that the foregoing

9    is a true and correct transcript of the stenographically

10   reported proceedings held in the above-entitled matter and that

11   the transcript page format is in conformance with the

12   regulations of the Judicial Conference of the United States.

13

14

15            Dated this 9th day of March, 2018.

16

17

18

19            /s/ Linda Faurote-Egbers
              Linda Faurote-Egbers, CSR NO. 622(IA)
20            FCRR, RMR, RPR, CSR (IA and IL)
              FEDERAL OFFICIAL COURT REPORTER
21

22

23

24

25